**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION**

| | | |
|---|---|---|
| **TIMOTHY COLEMAN et al.,** | ) | |
| | ) | **Civil No. 2:21-cv-02200-SHM** |
| **Plaintiffs,** | ) | |
| | ) | **JURY DEMAND** |
| **v.** | ) | |
| | ) | |
| **AMAZON.COM, INC.,** | ) | |
| **AMAZON LOGISTICS, INC.,** | ) | |
| **AMAZON.COM SERVICES, INC., and** | ) | |
| **JARS TD, INC.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

# JOINT MOTION AND INCORPORATED MEMORANDUM FOR FINAL APPROVAL OF AMENDED COLLECTIVE ACTION SETTLEMENT AGREEMENT

The Court previously preliminarily approved the Amended Settlement Agreement (the "Amended Settlement Agreement") [D.E. 73-2] on February 21, 2025 [D.E. 75] (the "Preliminary Approval Order").[1] Consistent with the Preliminary Approval Order, Plaintiff Timothy Coleman ("Plaintiff") and Defendants Amazon.com, Inc., Amazon Logistics, Inc., Amazon.com Services, Inc., (collectively, "Amazon") and JARS TD, Inc., ("Jars" together with Amazon, "Defendants", and together with Plaintiff, the "Parties") now file this Joint Motion and Incorporated Memorandum for Final Approval of the Amended Settlement Agreement (the "Joint Motion").[2]

[1] Any capitalized terms not defined herein have the meanings given to them in the Amended Settlement Agreement.

[2] The Declaration of Caroline Barazesh ("Barazesh Decl.") and Agreed Order of Dismissal are attached to this Joint Motion as Exhibits 1 and 2, respectively.

# I. BACKGROUND

## A. Procedural History Leading to the Amended Settlement Agreement

### *1. Plaintiffs' Lawsuit*

On April 1, 2021, Plaintiff, through counsel, filed this lawsuit against Defendants on behalf of himself. [D.E. 1]. On August 19, 2021, Plaintiff filed his First Amended Collective Action Complaint, on behalf of himself and those similarly situated. [D.E. 33]. The Amended Collective Action Complaint identifies the following group of similarly-situated individuals: all delivery drivers or driver associates who worked for the Defendants to provide last mile delivery services at any location within the three-year period preceding the filing of the original Complaint. [D.E. 33, ¶68].

### *2. Amazon and JARS Produced Substantial Data, Which Plaintiffs' Counsel Extensively Analyzed*

Plaintiffs invited Defendants to explore the potential for an early resolution of the alleged claims. The Parties entered into a Tolling and Mediation Agreement, to allow them an opportunity to explore potential resolution of the claims raised by Plaintiff.

Thereafter, the Parties engaged in an extensive alternative dispute resolution ("ADR") process in connection with these claims, which continued for several months. In order to appropriately inform the ADR process, the Parties exchanged substantial information subject to FRE 408. Specifically, the Parties exchanged data and information in connection with the alleged claims, including but not limited to JARS TD Inc.'s policy documents, payroll data, and timecard data, as well as delivery data for Delivery Associates ("DAs") who were paid by JARS TD Inc., and delivered packages purchased by customers on Amazon.com. Plaintiffs' Counsel reviewed and analyzed this data extensively. Prior to settling, counsel developed ample information from which to assess the probability of success, the possible range of recovery, and the likely expense

and duration of the litigation. Significantly, the data provided by both Amazon and JARS required extensive detailed analysis since it was produced in nearly raw format for each driver on a daily basis. Counsel was required to format and manipulate the data across hundreds of thousands of cells for thousands of delivery drivers to determine daily hours captured, weekly hours worked, regular rate owed vs. paid, and to further cross reference JARS time data with Amazon routing data. Based on counsel's expertise and ability to synthesize this data in a meaningful way, the Parties were able to speak and argue intelligently about the merits and pitfalls of the claims and defenses giving rise to this resolution.

This process allowed the Parties to assess the potential liability and possible damages for the asserted claims and engage in informed, good faith, arms'-length settlement negotiations.

***3. Mediation***

The Parties engaged in extensive ADR-related information exchanges and a full-day in-person mediation session, overseen by experienced wage and hour mediator, Michael Russell.[3] The in-person mediation session took place on April 28, 2022, in Brentwood, Tennessee. The mediation session was attended by the mediator, counsel for the Parties, and in-house counsel for Amazon (via zoom). Throughout this ADR process, the Parties, by and through their counsel, engaged in dozens of telephonic and video discussions, as well as written correspondence and negotiations.

[3] Mr. Russell is widely regarded as one of the best employment law mediators in Tennessee and nationally. He is a Nashville based mediator and arbitrator. He is a member of the National Academy of Distinguished Neutrals. Mr. Russell has been listed in Best Lawyers in America, Mid-South Super Lawyers, Top 100 Lawyers in Tennessee, and Top 50 Lawyers in Nashville. He is rated "AV Preeminent" by Martindale Hubbell and is a two-time recipient of Best Lawyers' "Nashville Lawyer of the Year" Award.

At the mediation, Defendants disputed the merits of Plaintiffs' claims and emphasized their belief that the enforceable arbitration agreements between the Parties precluded Plaintiffs from pursuing their claims on a class or collective basis. Plaintiffs maintained their position that the claims had merit and would be pursued through litigation or arbitration if a settlement was not reached. Additionally, Amazon denies it is a joint employer of the DAs. As noted above, to avoid the time, costs, and resources of resolving this dispute through litigation or arbitration, the Parties reached a tentative agreement to settle the claims of the DAs.

#### ***4. The Court's Initial Settlement Order and the Parties' Amended Settlement Agreement***

Following the mediation, the Parties worked together to negotiate the additional terms of their settlement agreement, such as the administration of the individual settlement payments, the language to be included in the notice to Potential Opt-In Plaintiffs, the service awards for Named Plaintiffs, and the maximum amount of attorneys' fees, costs, and expenses to be paid to Plaintiffs' counsel by Defendants upon approval by the Court. After such negotiations, the Parties agreed upon the Settlement and Release Agreement filed October 7, 2022 ("Initial Settlement Agreement") in conjunction with the Joint Motion for Approval of Collective Action Settlement. [D.E. 55].

On July 7, 2023, the Court issued an Order denying the Joint Motion for Settlement Approval and Joint Motion for Approval Collective Action Settlement ("Initial Settlement Order") [D.E. 70]. To address the issues raised in the Initial Settlement Order, the Parties then negotiated changes to the structure of their settlement and the terms of the Initial Settlement Agreement, which were memorialized in the Amended Settlement Agreement and explained in the Parties'

Joint Motion for Preliminary Approval of Amended Collective Action Settlement [D.E. 73] ("Preliminary Approval Motion").

As the Parties outlined in the Preliminary Approval Motion, the Parties incorporated several modifications in the Amended Settlement Agreement to address the points raised in the Initial Settlement Order. [D.E. 73 at 6-9]. Specifically, the Parties amended the settlement agreement to include: (i) a two-step approval process; (ii) notice to Potential Opt-in Members informing them of the minimum settlement payment they will receive if they opt-in to the settlement as well as the limited scope of the release that will bind them if they opt-in to the settlement; (iii) electronic and paper consent forms to be completed and ultimately filed with the Court; (iv) payment of settlement checks after written consent forms have been filed with Court and after entry of a Final Approval Order; (v) reduction in the total available attorneys' fees that could be awarded to Plaintiff's counsel; (vi) and *cy pres* of any unclaimed funds in lieu of a reversion of any such amounts back to Defendants; and (vii) clarification that the $10,000 payment to be made to Named Plaintiff Timothy Coleman is in exchange for his general release for all claims arising out of his employment as compared to the limited wage release Opt-In Plaintiffs would be signing.

**B. The Preliminary Approval Order**

This Court entered its Preliminary Approval Order on February 21, 2025 [D.E. 75]. In relevant part, the Court approved the Amended Settlement Agreement as fair, reasonable, and adequate. *Id.* at 19. Specifically, the Court held that seven (7) factors laid out by the Sixth Circuit in Granada supported the finding that the settlement is fair and reasonable. *Id*. at 11-19.

The Amended Settlement Agreement required the Defendants to provide the Settlement Administrator with a chart listing the names, employee identification numbers, last known addresses, email addresses, Social Security numbers, number of Qualifying Work Weeks, and any

other pertinent information necessary to the administration process as that information exists in the business records of JARS of the Potential Opt-In Plaintiffs. Upon provision of the data, the Settlement Administrator was to calculate the approximate amount for each Potential Opt-In Plaintiff's Individual Settlement Payment, in accordance with the formula set forth in the Amended Settlement Agreement.

Lastly, the Amended Settlement Agreement required that Notices be distributed by mail and email within 20 days after the receipt of the chart with the Potential Opt-In Plaintiffs' information and set a 90-day Opt-In Deadline. Within 60 days of the Opt-In Deadline, all Consent Forms shall be filed with the Court, upon which each Potential Opt-In Plaintiff who submitted a Consent Form will become an Opt-In Plaintiff and member of the Collective under the terms of the Amended Settlement Agreement, and thus subject to all terms applicable to Plaintiffs.

### C. The Notice Was Distributed and Approximate Individual Settlement Payments Were Calculated in the Form and Manner Approved by the Court

Analytics LLC is the Settlement Administrator approved by the Court. *See* Ex. 1, Barzesh Decl. ¶¶ 2-3. Consistent with the Court's Preliminary Approval Order and the Parties' Amended Settlement Agreement, JARS provided the Settlement Administrator with a spreadsheet containing the Potential Opt-In Plaintiffs' names, last known addresses, Social Security Numbers, Qualifying Workweeks, email addresses, phone numbers where available, and applicable employment information. *Id.* at ¶ 5. To calculate the Estimated Individual Share, the Settlement Administrator used the Qualifying Workweeks of each Potential Settlement Collective Member according to the allocation formula defined and explained in the Amended Settlement Agreement (the "Allocation Formula"). *Id.* at ¶ 7. *See also*, D.E. 73-2, Sec. 5.

Under the Allocation Formula, each Potential Settlement Collective Member initially was allocated a Minimum Payment of $25.00 out of the Total Maximum Settlement of $560,000. *Id.*

at ¶ 7; *see* D.E. 73.2 at Sec. 5.1. In addition to the Minimum Payment, each Potential Settlement Collective Member was assigned one (1) point for each Qualifying Workweek (i.e. a workweek in which the DA worked at least 35 hours). *Id.* at ¶ 7; *see* D.E. 73-2 at Sec. 5.2 (A). All points for Potential Settlement Collective Members were added together to obtain the Denominator. *Id.* at ¶ 7; *see* D.E. 73-2 at Sec. 5.2(B)(1). The total number of points for each Potential Settlement Collective Member was individually divided by the Denominator to obtain each Potential Settlement Collective Member's "Pro-Rata Portion." *Id.* at ¶ 7; *see* D.E. 73-2 at Sec. 5.2(B)(2). Each Potential Settlement Collective Member's Pro Rata Portion was multiplied by the Net Settlement Amount. *Id.* at ¶ 7; *see* D.E. 73-2 at Sec. 5.2(B)(3). The resulting amount was added to each Potential Collective Settlement Member's Minimum Payment to determine the Estimated Individual Payment for each Potential Collective Settlement Member. *Id.* at ¶ 7; *see* D.E. 73-2 at Sec. 5.2(C).

The Settlement Administrator processed and updated the mailing addresses for each Potential Settlement Collective Member by using the National Change of Address Database. Ex. 1, Barazesh Decl. at ¶6. The Settlement Administrator also obtained a mailing address for receiving Consent Forms, written exclusion requests, undeliverable Notices, and other communications relating to the settlement; a toll-free telephone number for Potential Settlement Collective Members to call with questions about the settlement; and a website address of www.JARSTDwagesettlement.com. *Id.* ¶ 8. The website included the Notice, Consent Form, Order Granting Motion for Preliminary Approval, and Amended Settlement Agreement for viewing, downloading, or printing. *Id.* The website also contained the option to submit a Consent Form electronically as well as additional information about the settlement. *Id.*

On February 26, 2025, the Settlement Administrator received copies of the Court-approved Notice and Consent Form from counsel for Plaintiff. Ex. 1, Barazesh Dec. at ¶ 4. The Settlement Administrator then completed the Notice by, for example, adding dates for the Opt-In Deadline of June 25, 2025. (*Id.*) Counsel for the Parties approved the final Notice that the Settlement Administrator prepared. On March 27, 2025, the Settlement Administrator mailed and emailed the Notices, including the Consent Forms, to each of the 3,202 Potential Opt-in Plaintiffs. *Id.* at *Id.* ¶¶ 9-10. The Notice advised the Potential Opt-In Plaintiffs that they could submit a Consent Form postmarked by June 25, 2025. *Id.* Additionally, seven (7) self-identifying Potential Opt-In Plaintiffs contacted the Settlement Administrator to request inclusion in the settlement (the "Self-IDs"). *Id*. at ¶ 13. The Parties agreed that the Self-IDs should receive Notice, and the Settlement Administrator sent Notice to the Self-IDs. *Id.*

On May 27, 2025, the Settlement Administrator sent one reminder Notice via mail and email to the Potential Opt-In Plaintiffs who had not yet filed a Consent to Join Form. *Id*. at ¶ 16. The reminder Notice contained all of the same information that was contained in the original Notice sent on March 27, 2025.

A total of forty-seven Notices were returned to the Settlement Administrator with a forwarding address, and 428 Notices were returned as undeliverable without a forwarding address. *Id.* ¶¶ 12. The Settlement Administrator promptly re-mailed the Notices to the forwarding addresses provided by USPS. *Id.* ¶ 13. For the remaining 428 Notices, the Settlement Administrator performed address traces for each of the Potential Opt-In Plaintiffs and located 368 more current addresses. *Id.* ¶ 12. 3,142 Settlement Collective members (92.61%) received Notice by mail. *Id.* ¶ 14. 2,870 Settlement Collective Members (89.85%) received Notice by email. *Id.* ¶ 15. 3,179 Settlement Collective Members (99.28%) received a Notice by mail and/or email. *Id.* ¶

16. 2,296 Settlement Collective Members received a Reminder Notice by mail and/or email. *Id.* ¶ 19.

The Settlement Administrator has received 1,235 valid Consent Forms. *Id.* ¶ 21. The Settlement Administrator also received five (5) Consent Forms that were submitted with a postmark after the Opt-In Deadline and with complete information. *Id.* Counsel for the Parties agreed to accept these late Consent Forms, so all five Consent Forms are considered valid Consent Forms. *Id*.

The Settlement Administrator received one objection to the Pro Rata Share calculated for a Potential Opt-in Plaintiff, and by agreement of the Parties, that Potential Opt-In Plaintiff's claim was recalculated. *Id.* ¶ 20. Specifically, the objector identified a number of workweeks where he continued to deliver packages to Amazon clients while working for JARS, despite his title of Team Lead. Since he continued to act as a Delivery Associate, and thus fell within the collective definition, the additional weeks were included. Otherwise, no other objections regarding the Settlement were received.

**D. The Updated Calculation of the Individual Settlement Payments**

To the extent there was less than 100% participation, any unused portion of the Net Settlement Fund was defined by the Amended Settlement Agreement as Unused Funds. Consistent with the terms of the Amended Settlement Agreement, the amounts of the Estimated Individual Payments of individual who filed Opt-in Forms, were recalculated by the Settlement Administrator taking into account the Unused Funds. Ex. 1, Barazesh Decl. ¶ 22; *see* D.E. 73-2 at Sec. 5.2(C)). The Allocation Formula explained above was used, to recalculate the Estimated Individual Payment of each Opt-in Plaintiff, provided however, that no Opt-in Plaintiff's Final Individual Settlement Amount would be more than 150% of their original Estimated Individual Payment. *Id.*; *see* D.E. 73-2 at Sec. 5.3. Therefore, each Opt-in Plaintiff's Estimated Individual Payment was

increased by their pro-rata share of the Unused Funds up to a maximum amount of 150% of the Estimated Individual Payment. Given the amount of Unused Funds, each Opt-in Plaintiff received 150% of their Estimated Individual Payment resulting in a substantial increase in individual distributions.

The chart below explains the distribution of the Total Maximum Settlement Amount of $560,000.00 (which figure does not include Service Awards, Plaintiffs' Attorneys' Fees and Expenses, or the Administration Fee):

| Total Maximum Settlement Amount Distribution | | |
|---|---|---|
| | **Agreed Maximum Amounts** (Pre-Notice, assuming 3,202 Opt-In Plaintiffs and 1 Named Plaintiffs) | **Actual Amounts to Be Paid** (Post-Notice, 1,235 Opt-In Plaintiffs and 1 Named Plaintiffs) |
| Minimum Settlement Amount | $80,050.00 | $17,025 |
| Net Settlement Amount | $479,950.00 | $426,280.67[4] |
| **Total** | **$560,000.00** | **$443,305.67** |

### E. The Key Remaining Deadlines and Settlement Terms

Upon the Court's Order granting this Joint Motion, the remaining key deadlines will be triggered:

- Upon the Court's entry of the Final Approval Order and entry of the Order of Dismissal, the Opt-in Plaintiff's release of the Released Claims against the Released Parties shall become effective. [D.E. 73-2, Sec. 9]

- Within 45 days after the latter of the following: the Court enters the Final Approval Order; the Court approves an award of Attorney's Fees and Expenses; and the Settlement Administrator provides Defendants with the estimated share of employer's payroll taxes, the Total Maximum Settlement Amount, Individual Release Payment, and Attorney's

[4] The actual amounts to be paid out of Net Settlement Amount equal the Claimed Settlement Amount. No portion of the Maximum Settlement Amount shall revert to Amazon or JARS (the "Cy Pres Amount"). (D.E. 73-2 at Sec. 5.3). If any Opt-In Plaintiff does not cash the check distributed to him or her by the Check Deposit Deadline, and there is no request by such Opt-In Plaintiff for a new check within 30 days after the Check Deposit Deadline, the monetary amount allocated to all such Opt-In Plaintiffs shall be donated to the Cy Pres Recipient, like the Cy Pres Amount, which is the Legal Services Corporation, as provided in Section I.E, *infra*. [D.E. 73-2, Sec. 5.3].

Fees and Expenses shall be deposited into the QSF by or on Defendants' behalf. [D.E. 73-2, Sec. 6].

- Within 5 days after the Attorney's Fees and Expenses are deposited into the QSF, the Settlement Administrator shall pay such amount by wire transfer to Plaintiffs' counsel.[5] [D.E. 73-2, Sec. 8.2].

- After all of Amazon and JARS Tax Obligations have been paid and the Check Deposit Deadline has passed, the Settlement Administrator shall redistribute the Cy Pres Amount for donation to the nonprofit charitable organization identified by the Parties in this Joint Motion, which is the Legal Services Corporation, as further explained below. [D.E. 73-2, Sec. 5.3]

The Amended Settlement Agreement provides that the Cy Pres Amount shall be donated by the Settlement Administrator "to a nonprofit charitable organization to be identified by the Parties in the Motion for Final Approval". [D.E. 73-2, Sec. 5.3]. Accordingly, the Parties now identify the Legal Services Corporation, which is a 501(c)(3) organization whose primary purpose is to promote equal access to justice; fund high-quality civil legal assistance to low-income Americans; and raise public awareness about civil legal aid.

## II. ARGUMENT AND AUTHORITIES

### A. Standard for Approval of FLSA Collective Action Settlements

FLSA claims brought by an employee against an employer under 29 U.S.C. § 216(b) can be settled and released if the parties present the district court with a proposed settlement, and the district court enters a stipulated judgment approving the fairness of the settlement. *See Lynn's Food Stores, Inc. v. United States*, 679 F.2d 1350, 1353 (11th Cir. 1982). In reviewing a settlement of a private FLSA claim, the Court must scrutinize the proposed settlement for fairness and

[5] If any portion of the maximum $430,000.00 for Attorneys' Fees and Expenses is not approved by the Court, such Unapproved Fee Amount shall be redistributed to the Settlement Collective in accordance with Section 5 of the Amended Settlement Agreement. [D.E. 73-2, Sec. 8.5]. Of the maximum $430,000.00 in Attorneys' Fees and Expenses, $40,000 is for the Administrative Fee, $10,000 is for expenses, and the remaining $380,000 is for fees (representing 38% of the total settlement amount to be paid by Defendants).

determine whether the settlement is a "fair and reasonable resolution of a bona fide dispute over FLSA provisions." *Lynn's Food Stores, Inc.*, 679 F.2d at 1355; *see also Doe 1-2 v. Deja Vu Servs., Inc.*, No. 2:16-CV-10877, 2017 WL 2629101, at *8 (E.D. Mich. June 19, 2017), *aff'd sub nom. Does 1-2 v. Deja Vu Servs., Inc.*, 925 F.3d 886 (6th Cir. 2019)*; Bartlow v. Grand Crowne Resorts of Pigeon Forge*, No. 3:11-CV-400, 2012 WL 6707008, at *1 (E.D. Tenn. Dec. 26, 2012); *Simmons v. Mathis Tire & Auto Serv., Inc.*, No. 13-2875-STA-TMP, 2015 WL 5008220, at *1 (W.D. Tenn. Aug. 20, 2015). A settlement that "reflect[s] a reasonable compromise over issues, such as FLSA coverage or computation of back wages[] that are actually in dispute" meets this test of resolving a "bona fide dispute." *Lynn's Food Stores*, 679 F.2d at 1354; *accord Alvarez v. BI Inc.*, No. CV-16-2705, 2020 WL 1694294, at *4 (E.D. Pa. Apr. 6, 2020).

### B. The Parties' Settlement Is a Fair and Reasonable Resolution of a *Bona Fide* FLSA Dispute

#### *1. A Bona Fide Dispute Exists*

The first requirement for court approval of an FLSA settlement has been met because the Court already ruled in the Preliminary Approval Order, based on the Parties' extensive arguments in the Preliminary Approval Motion (*see* D.E. 73 at 10; 13-14), that a *bona fide* dispute exists. D.E. 75 at 10 ("The Court is satisfied that Defendants' FLSA liability was actually and reasonably in dispute."). As the Court recognized, "There is a bona fide dispute. . . .[t]he parties contest several legal and factual issues that would significantly affect the outcome of the case. . . . [t]hose legal and factual disputes would have required judicial resolution had the parties not reached a settlement." D.E. 75 at 11 (citing *Shaffer v. LCPZ Canton, Inc.*, No. 5:14-cv-2304, 2015 WL 236564, at *2 (N.D. Ohio Jan. 16, 2015)(finding a bona fide dispute where the parties had divergent views of the facts and a good-faith disagreement on the applicable law)). The Court's findings in the Preliminary Approval Order remain true and support granting the Joint Motion.

### *2. The Amended Settlement Agreement Is Fair and Reasonable*

The second requirement is met because the Amended Settlement Agreement is fair and reasonable, as the Court ruled in its Preliminary Approval Order. D.E. 75 at 11-20. In determining whether an FLSA settlement is fair and reasonable, the following factors are relevant: "(1) the risk of fraud or collusion; (2) the complexity, expense, and likely duration of the litigation; (3) the amount of discovery completed; (4) the likelihood of success on the merits; (5) the opinion of class counsel and representatives; (6) the reaction of absent class members; and (7) public interest in the settlement." *Athan v. United States Steel Corp*., 523 F.Supp.3d 960, 965 (E.D. Mich. 2021) (citing *Granada Investments, Inc. v. DWG Corp*., 962 F.2d 1203, 1205 (6th Cir. 1992)); see also *Fitzgerald v. P.L. Mktg., Inc.,* No. 2:17-CV-02251-SHM-cgc, 2020 WL 3621250, at *6 (W.D. Tenn. July 2, 2020) (Mays, J.). As the Court previously held, assessment of each of these factors demonstrates that the Amended Settlement Agreement is fair and reasonable. D.E. 75 at 11-19.

#### a. <u>No Fraud or Collusion</u>

As the Court ruled in the Preliminary Approval Order, and as the Parties explained in the Preliminary Approval Motion, there is no evidence of, nor was there any, fraud or collusion between counsel with regard to the Amended Settlement Agreement. *See* D.E. 75 at 12 ("There is no evidence of fraud or collusion in the parties' settlement."). This settlement was reached as a result of arms-lengths negotiations and a mediation conducted by a neutral third-party mediator, Michael Russell, between the Parties through experienced wage and hour attorneys. *Schneider v. Goodyear Tire & Rubber Co.*, No. 5:13-2741, 2014 WL 2579637, at *2 (N.D. Ohio June 9, 2014) (considering the risk of fraud or collusion between the parties in determining whether to approve an FLSA settlement and concluding that because the parties had engaged in court-supervised negotiations, there was no such risk).

During the litigation and settlement of this action, Plaintiffs were represented by counsel both respected in the community and experienced in handling wage and hour collective actions. Plaintiffs' counsel have the experience to assess the risks of continued litigation and benefits of settlement and have done so in this action. Plaintiffs' counsel represents employees with claims against employers similar to the claims asserted in this case. Defense counsel are likewise well respected and experienced in defending similar claims. Counsel for both Parties have advised their respective clients regarding the settlement, and they have recommended judicial approval. Those recommendations, the Parties respectfully submit, should be afforded some weight. *See Lynn's Food Stores*, 679 F.2d at 1354 (recognizing that courts rely on the adversary nature of a litigated FLSA case resulting in settlement as an indication of fairness).

**b. <u>Complexity, Expense, and Likely Duration of the Litigation</u>**

The complexity, expense, and likely duration of the litigation favor finally approving the Amended Settlement Agreement because the litigation presents difficult legal questions, as the Court held in the Preliminary Approval Order. *See* D.E. 75 at 13 ("The complexity, expense and likely duration of the litigation weigh in favor of settlement approval."). The complexity, expense, and likely duration of the litigation should a settlement not have been reached weighs heavily in favor of finding that this settlement is fair and reasonable. Without question, if the case does not settle, the Parties will have to spend significant time and resources, whether in litigation or arbitration, completing extensive discovery, including written discovery and depositions of various Plaintiffs, putative members of the collective, and Amazon's and JARS's upper management witnesses, as well as expert discovery. After the resolution of these issues, the Parties would have faced the prospect of expensive and lengthy litigation, as noted by this Court. *Id.* Rather than take this path, the Parties directed their efforts toward an early, informed, efficient resolution of Plaintiffs' claims. Preparation for the Parties' mediation session enabled counsel to assess the

respective strengths and weaknesses of their case and reach the conclusion that settlement is in the Parties' best interest.

### c. Discovery Completed

"The amount of discovery completed favors finally approving the Amended Settlement Agreement, as the Court ruled in the Preliminary Approval Order." D.E. 75 at 14. Defendants produced substantial informal discovery including payroll and timekeeping data, JARS policy documents, timecard data, delivery data, delivery packages purchased by customers on Amazon, all of which was reviewed and extensively analyzed by Plaintiff's counsel. Given the amount of discovery conducted, it was Plaintiff's counsel belief then, and now, that the approval of Amended Settlement Agreement is in the best interests of the Named Plaintiff and Opt-in Plaintiffs. *Id*. at 14-15.

### d. Likelihood of Success on the Merits

The likelihood of Plaintiff's success on the merits—the most important factor[6]—favors finally approving the Amended Settlement Agreement, as the Court ruled in the Preliminary Approval Order, because Plaintiff's likelihood of "success on the merits is far from certain." D.E. 75 at 16. As the Parties detailed in the Preliminary Approval Motion [D.E. 73 at 19] , the Maximum Settlement Amount is fair and reasonable in light of the significant hurdles to recovery, most notably the challenges in determining the amount of "off-the-clock" time worked, prevailing on Plaintiff's joint employer theory of liability, and overcoming Defendants numerous defenses to the claims asserted. For the following reasons, and as further detailed in the Parties' Preliminary Approval Motion [D.E. 73 at 14–16], prevailing on the merits is far from certain.

[6] D.E. 75 at 15 (citing *Poplar Creek Dev. Co. v. Chesapeake Appalachia, L.L.C.,* 636 F.3d 235, 245 (6th Cir. 2011)) (stating likelihood of success on the merits is most important factor).

As explained in the Parties' Preliminary Approval Motion, the claims as originally brought against the Defendants, as joint employers, alleged that DAs who were delivering Amazon packages through JARS were required to work off the clock pre-shift and post-shift, and that JARS automatically deducted lunchbreaks. Upon meaningful analysis of the data provided, the automatic lunch deduction of 30 minutes each day was discontinued in the middle of 2019. Additionally, JARS asserted a defense under *White v. Baptist*, that the company asked the drivers to report if they worked through their lunch period, and if the answer was yes, they were paid for such work. *See White v. Baptist Mem'l Health Care Corp*., 699 F.3d 869 (6th Cir. 2012) (Employer not liable under FLSA for unpaid meal breaks, where employer established reasonable process for employee to report uncompensated work time, and employees failed to report missed meal breaks nonetheless). JARS also produced contemporaneous signed daily logs that evidenced Plaintiff and other DAs did in fact alert JARS on occasions when they worked through their lunch breaks. Further, many of the DAs were not scheduled for more than 3 or 4 days per week and did not regularly work more than 40 hours. Of the data provided, approximately 25% of the weeks reflected a workweek where 40 or more hours were worked. As such there was a significant gap-time issue for which the FLSA does not provide relief. Notwithstanding, the recovery in this matter captures those workweeks where putative collective members worked at least 35 hours thereby providing relief for the gap time claims. Additionally, the off the clock claims of Plaintiff were hotly contested by the Defendants and not clearly evidenced in the records.

Prior to notice, the Maximum Settlement Amount would have compensated members of the putative settlement collective in an amount that equates with approximately 1.5 hours of off-the-clock work in each qualifying work week. Given the realistic estimate of 1-3 hours of off the clock work per week, this result, provides 50%-100% of the unpaid wages asserted as owed by the

putative collective over a three-year period. For a wage and hour case arising from allegations of off-the-clock work, such a result is excellent.

Post notice, the amount to be paid to Opt-in Plaintiffs is imminently reasonable as compared to what could be potentially obtained at trial, especially in light of the redistribution of Unclaimed Funds up to 150% of the initial Estimated Individual Payments. Each Opt-in Plaintiff is now going to receive 150% of the pre-notice initial Estimated Individual Payment.

Pre-Notice, there were 3,202 putative settlement collective members, of which 1,793[7] putative class members only worked 2 or less weeks for JARS. The remaining 1,409 putative settlement collective members worked more than 2 qualifying workweeks. Pre-Notice, each putative collective settlement member would have received a minimum payment of $25 regardless of the number of qualifying workweeks. For those pre-notice collective members that stopped working in 2018, the $25 payment approximated 3.13 hours of "off the clock" work at $8.00 per hour, the prevailing hourly rate paid by JARS. For those pre-notice putative collective members that worked through 2019 and 2020 the $25 payment approximated 1.67 hours of "off the clock" work at $15.00 per hour, the prevailing hourly rate paid by JARS. For the 1,409 pre-notice putative settlement collective members that worked more than 2 qualifying workweeks, the average recovery was approximately $340.63 in addition to the guaranteed $25 minimum payment.

Now, each of the 452 Opt-in Plaintiffs that worked 2 or less weeks, will receive $37.50, increasing their individual recoveries to 4.69 hours for those who were paid $8 dollars an hour, and 2.5 hours for those who were paid $15 an hour. Of the remaining 783 Opt-in Plaintiffs, the average recovery from the settlement is $558.62, with a minimum recovery of $132.33 and a maximum recovery of $2,281.70. The chart below shows how the actual Individual Settlement

[7] Of the 3,202 putative settlement collective members, 903 had no qualifying workweeks, defined as a work week with 35 hours worked. 360 had one qualifying workweek, and 530 had two qualifying workweeks.

Payments to be made are much higher than the amounts that the Parties estimated in their Preliminary Approval Motion:

| **Average Individual Settlement Payments Higher Than Originally Estimated** | | |
|---|---|---|
| **Portion of Collective** | **Pre-Notice Average Estimated Payments** | **Actual Average Amounts to Be Paid** |
| Across Entire Collective | $174.89 | $370.05 |
| Minimum Payment Group | $25.00 | $37.50 |
| Non-Minimum Payment Group | $340.63 | $558.62 |

These amounts represent a fair and reasonable settlement of highly disputed claims, particularly in light of the hurdles to recovery described herein and in the Parties' Preliminary Approval Motion. D.E. 73.

As explained in the Preliminary Approval Motion [D.E. 73 at 8], there is no longer a reversion of the Unclaimed Funds to Defendants in any capacity. All funds that are not distributed to Opt-in Plaintiffs will be donated to the Cy Pres Recipient, further underscoring the total benefit provided by this settlement.

Notably, although the opt-in rate for this settlement is 38%, nearly 80% ($443,306.67) of the total Maximum Settlement Amount will be distributed to the Opt-in Plaintiffs, with approximately $116,694.33 to be donated to the Cy Pres Recipients. The Parties agree that the Amended Settlement Agreement represents a negotiated compromise to resolve this dispute, without either party having conceded their position on the merits and without there having been any finding of wrongdoing by any Party.

**e. <u>Opinions of Class Counsel and Representatives</u>**

"When considering a proposed settlement, the court 'should defer to the judgment of experienced counsel who has competently evaluated the strength of his proofs.'" *Level v. Monsanto Research Corp.*, 191 F.R.D. 543 557 (S.D. Ohio 2000) (quoting *Williams v. Vukovich*,

720 F.2d 909, 922-23 (6th Cir. 1983)). "[T]he opinions of counsel should be given considerable weight if counsel is familiar with the litigation and has previous experience with similar cases." *Lopez v. Silfex, Inc.*, No. 3:21- cv-61, 2021 WL 5795280, at *7 (S.D. Ohio Dec. 3, 2021) (internal quotations omitted). As the Court noted in the Preliminary Approval Order, both counsel for Plaintiff and Defendants have extensive experience in FLSA collective action litigation, and agree that the Amended Settlement Agreement is in the best interests of all parties involved, including the Opt-In Plaintiffs. D.E. 75 at 17. "Given the experience and informed judgment of counsels and class representatives, this factor weighs in favor of settlement approval." *Id*.

**f. <u>Reaction of Absent Class Members</u>**

As the Court stated in the Preliminary Approval Order, "[b]ecause this is an opt-in FLSA collective action, there are no absent class members whose interests need to be considered. Under the FLSA, no individual can be bound by a settlement unless that individual affirmatively opts in to the collective action. See 29 U.S.C. § 216(b)." D.E. 75 at 18. Because all Opt-In Plaintiffs made an informed decision, and no objections to the settlement were received, this factor continues to weigh in favor of Final approval of the Amended Settlement Agreement.

**g. <u>Public Interest in Settlement</u>**

The public interest factor weighs in favor of settlement approval. As stated by the Court in the Preliminary Approval Order, "[t]he proposed settlement resolves a complex dispute, eliminates uncertainty for all parties, and saves the substantial time and expense of prolonged litigation." D.E. 75 at 19 (*citing Dillworth v. Case Farms Processing*, Inc., No. 5:08-cv-1694, 2010 WL 776933, at *6 (N.D. Ohio Mar. 8, 2010) (finding that the public interest favored settlement because it provided "certainty and finality" in a complex case where "there is no guarantee that Plaintiffs would prevail at trial"); *see also Does 1-2*, 925 F.3d at 899 (finding that the public interest favored "putt[ing] an end to potentially long and protracted litigation"). "The settlement serves both the

best interests of the parties and the broader goals of judicial economy." D.E. 75 at 19. As such, this factor in is favor of finally approving the Amended Settlement Agreement.

### C. Final FLSA Certification

Lastly, because the Parties desire to finally conclude their settlement, the Parties respectfully request that, for settlement purposes only, the Court finally certify the following collective:

> All current and former Delivery Associates who were paid by JARS to deliver packages to customers of Amazon in the United States between October 29, 2018 and April 30, 2022.

("Settlement Collective").

## III. CONCLUSION

Accordingly, the Parties respectfully request that the Court grant the Joint Motion, finally approve the Parties' Amended Settlement Agreement, finally certify the Settlement Collective, and Dismiss this Action with prejudice.

DATED: September 29, 2025

**MORGAN & MORGAN, P.A.**
By: */s/ Andrew R. Frisch*
Paul M. Botros, Esq.
Florida Bar No. 063365
Andrew Frisch, Esq.
Florida Bar No. 027777
8151 Peters Road - Suite 4000
Plantation, Florida 33324
T: (954) WORKERS
F: (954) 327-3017
pbotros@forthepeople.com
afrisch@forthepeople.com

*Attorneys for Plaintiff Timothy Coleman*

**JACKSON, SHIELDS, YEISER, HOLT OWEN & BRYANT, ATTORNEYS AT LAW**
By: */s/ J. Russ Bryant*
J. Russ Bryant (TN BPR #33830)
Robert E. Morelli, III (TN BPR #037004)
262 German Oak Drive
Memphis Tennessee 38018
Telephone: (901) 754-8001
Facsimile: (901) 754-8524
rbryant@jsyc.com
rmorelli@jsyc.com

*Attorneys for Defendant JARS TD, Inc.*

Respectfully submitted,
**SEYFARTH SHAW LLP**
By: */s/ Kyle A. Petersen*
James J. Swartz (TN BPR #034873)
Kevin M Young, *admitted pro hac vice*
SEYFARTH SHAW LLP
1075 Peachtree Street, N.E., Suite 2500
Atlanta, Georgia 30309
Tel.: (404) 885-1500
Fax: (404) 892-7056
jswartz@seyfarth.com
kyoung@seyfarth.com

Kyle A. Petersen, *admitted pro hac vice*
SEYFARTH SHAW LLP
233 South Wacker Drive, Suite 8000
Chicago, Illinois 60606
Tel.: (312) 460-5200
Fax: (312) 460-7000
kpetersen@seyfarth.com

*Attorneys for Defendants Amazon.com, Inc., Amazon Logistics, Inc., and Amazon.com Services, Inc.*